**FILED**

**MARCH 6, 2008**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**08 C 1357**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**JUDGE GUZMAN**
**MAGISTRATE JUDGE ASHMAN**



|  |  |  |
|---|---|---|
| John D. Veleris, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: |
| | ) | |
| Deutsche Bank AG; and Deutsche Bank | ) | Jury Trial Demanded |
| Securities, Inc., d/b/a Deutsche Bank | ) | |
| Alex. Brown, | ) | |
| | ) | **J. N.** |
| Defendants. | ) | |

## COMPLAINT

Plaintiff John D. Veleris ("Veleris") hereby complains against Deutsche Bank AG ("Deutsche Bank AG"), and Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex. Brown, a division of Deutsche Bank Securities, Inc. ("DBSI") (collectively "Deutsche Bank"), and in support states as follows:

### NATURE OF THE CASE

1.     This case arises out of defendants' participation, in concert with the now defunct law firm Jenkens & Gilchrist ("Jenkens"), in a conspiracy to create, market, sell, and implement an illegal "Son of BOSS" tax shelter to plaintiff during 2000. Ultimately, defendants and the other co-conspirators stated and acted as though the tax shelter was a legitimate transaction that took advantage of a valid "loophole" in the federal tax code. Each of the defendants and co-conspirators played a role in the creation, marketing, sale, and/or implementation of the Son of BOSS shelter. All committed wrongful acts in furtherance of the conspiracy.

2.     The Deutsche Bank defendants at all times gave plaintiff the impression that the trading and other financial machinations underlying the tax shelter were valid and legitimate.  They did this, in part, by preparing and circulating to plaintiff certain documents, including trade confirmations and account statements.  In reality, however, lacking economic substance, Son of BOSS was not a legitimate investment—it was not even a legitimate tax strategy—and defendants knew it.  Defendants and the other co-conspirators nonetheless participated in the Son of BOSS conspiracy and reaped tens of millions of dollars in illicit profits at the expense of plaintiff and other tax shelter participants.

3.     As part of the scheme, defendants and their co-conspirators nonetheless made or endorsed representations that:

(a)     The capital and/or ordinary losses created by the shelters were legitimate, proper and in accordance with all applicable tax laws, rules, and regulations;

(b)     The design of the transaction made economic and investment sense, could generate a profit and therefore had business purpose and economic substance; and

(c)     The legitimacy of the shelters would be verified by a legal opinion provided by respected and purportedly independent law firms.

4.     In fact, however, the transactions in which defendants encouraged Veleris to engage were nothing more than illegitimate tax shelters.  In direct contravention of established rules, regulations and laws governing tax shelters, the shelters involved the establishment of entities to engage in transactions that were economically valueless.

5.     Defendants developed (or were at least aware of the development of) Son of BOSS with Jenkens for the express purpose of generating fees.  Indeed, defendants, along with Jenkens, developed a fee sharing arrangement that remained undisclosed to

Veleris throughout the transaction. Indeed, one of Veleris' trusted advisors received a secret, undisclosed referral fee from Jenkens for recommending that Veleris work with Jenkens and engage in Son of BOSS. Upon information and belief, some or all of the defendants may have received undisclosed payments as well.

6.     Plaintiff reasonably relied on the advice and actions of the co-conspirators, who were widely considered to be some of the most well respected firms in their respective fields, and agreed to participate in Son of BOSS. Defendants and their co-conspirators artificially generated substantial tax losses for Veleris, though no real losses ever occurred and though there was never any real economic risk involved in the transactions. This loss was deducted from Veleris' taxable income and generated significant tax savings.

7.     Defendants knew that in light of the well-established legal doctrine disallowing the recognition of losses from transactions that lacked "economic substance," the tax shelter would not withstand an audit by the IRS. Not only was this "economic substance doctrine" established in case law, it was also confirmed in several IRS Notices, including IRS Notice 99-59 and 2000-44, both having been published prior to the filing of Veleris' 2000 tax return. In December 2001, just months after the tax returns were filed, the IRS announced an amnesty program that would have allowed Veleris to amend his tax returns and avoid the assessment of accuracy-related penalties by the IRS. The co-conspirators were well aware of this program. Plaintiff believes that none of the co-conspirators ever told him about the amnesty program. In any event, none of the co-conspirators ever recommended to plaintiff that he participate in the program. As a result, when Veleris was audited by the IRS, the IRS found that Veleris had entered into

illegal tax shelters for the years 2000 and 2001.  The IRS and State of Illinois assessed

taxes, interest, and penalties on Veleris for his 2000 and 2001 returns, and a settlement

for those amounts was offered in late 2004, but not finalized until 2005.

8.    In March 2007, the U.S. Department of Justice entered into a non-

prosecution cooperation agreement with Jenkens, which has now closed its doors as a

result of its illicit tax shelter practice.  In connection with this agreement, Jenkens

admitted to developing and marketing fraudulent tax shelters, as well as to issuing

fraudulent opinion letters.  Specifically, Jenkens admitted that "certain J&G attorneys

developed and marketed fraudulent tax shelters, with fraudulent tax opinions."  The

defendants knowingly and intentionally participated in this very misconduct.  Also in

March 2007, the IRS reached a deal with Jenkens pursuant to which Jenkens agreed to

pay a $76 million penalty for its tax shelter work.  Finally, a class of plaintiff sued

Jenkens & Gilchrist for Jenkens improper marketing of tax shelters.  Eventually, Jenkens

agreed to settle the *Denney v. Jenkens & Gilchrist* litigation for $70 million and in

January 2007 a final judgment was entered.  (Plaintiff is a member of that class, but has

not yet received any class payments.)

9.    As a result of the conspiracy alleged herein, plaintiff suffered considerable

losses, including but not limited to back taxes and penalties and exorbitant professional

fees.  Based on these facts, and as more fully detailed below, plaintiff seeks recovery for

back taxes, penalties interest, fees and costs against defendants for conspiracy, common

law fraud, negligent misrepresentation, violation of the Illinois Consumer Fraud &

Deceptive Trade Practices Act, and assisting in Jenkens breaches of fiduciary duty.

**PARTIES AND OTHER RELEVANT PERSONS**

10.    Veleris is a resident of Wilmette, Illinois.

11.    Defendant Deutsche Bank AG is a German corporation with its principal

place of business at Taunusanlage 12, 60325 Frankfurt am Main, Germany.  Deutsche

Bank AG is the largest bank in Germany and one of the largest banks in the world with

2006 profits of $5.9 billion Euros ($8.6 billion) on revenues of 18.7 billion Euros ($27.4

billion).  Deutsche Bank AG offers various investment, financial, and related products

and services to consumer and corporate clients worldwide.  Deutsche Bank AG has some

82,000 employees and more than 12 million customers in 75 countries worldwide.

Deutsche Bank AG has a leading position in international foreign exchange, fixed-

income and equities trading, and is a recognized leader in all aspects of foreign exchange.

Deutsche Bank AG is one of the top global foreign exchange providers.  Its only branch

in the United States is located in New York City.  Deutsche Bank AG has conducted

business in Illinois sufficient to establish minimum contacts within the forum that support

the exercise of jurisdiction over it by this Court.  Notably, Deutsche Bank AG was

involved in the creation and implementation of Son of BOSS that forms the basis for the

claims alleged herein.  Deutsche Bank AG can be served via its counsel, Lawrence Hill,

Dewey & LeBoeuf, 1301 Avenue of the Americas, New York, NY, 10019-6092.

12.    Upon information and belief, DBSI is a wholly-owned subsidiary of

Deutsche Bank and a member firm of the New York Stock Exchange.  DBSI was formed

as the result of Deutsche Bank's acquisition of BT Alex. Brown, Inc., the United States'

oldest brokerage firm.  On information and belief, defendant DBSI is a Delaware

corporation with its principal place of business at 31 West 52nd Street, New York, New

5

York, 10019. DBSI is licensed to do business in this state and has conducted business in Illinois sufficient to establish minimum contacts within the State that support the exercise of jurisdiction over it by this Court. Notably, DBSI was involved in the creation and implementation of Son of BOSS that forms the basis for the claims alleged herein. DBSI has offices in Cook County, Illinois and may be served via its counsel, Lawrence Hill, Dewey & LeBoeuf, 1301 Avenue of the Americas, New York, NY, 10019-6092.

13.     PDJ Inc., formerly known as LaFrancaise Bakery, Inc. ("LaFrancaise"), is an Illinois corporation. In 2000, Veleris worked for LaFrancaise. In addition, he was to receive a "success fee" for assisting in the sale of LaFrancaise.

14.     JD Sprucewood Investments, LLC ("JD Sprucewood") is a Delaware limited liability corporation formed in November 2000. At all relevant times, Veleris was the sole shareholder of JD Sprucewood.

15.     John Veleris & Associates, Inc. ("Veleris & Associates") is an Illinois S corporation. At all relevant times, Veleris was the sole shareholder of Veleris & Associates.

16.     JV Investment Partners ("JV Partners") is an Illinois general partnership formed in November 2000. At all relevant times, JD Sprucewood was the managing partner and 99% owner of JV Partners.

### Non Party Co-Conspirators

17.     In 2000, Jenkens was a large law firm with hundreds of attorneys and offices in nine major U.S. cities, including in Chicago. It claimed expertise in a variety of industries and market segments, including antitrust, bankruptcy, construction, securities, financial institutions, financial services, environmental, franchise and

distribution, health, immigration, intellectual property, international tax, litigation, technology, and real estate law.  At its peak in 2001, the firm's gross revenue was $312 million.  Since the mid-1990s, Jenkens has earned as much as $267 million in fees from its work involving tax shelters, including Son of BOSS.

18.    Paul Daugerdas was a Jenkens partner.  He is a resident of Illinois. Between 1999 and 2003, Daugerdas earned at least $93 million—largely from his work involving tax shelters like the Son of BOSS shelter sold to plaintiff.  Daugerdas has been under investigation by a grand jury in the Southern District of New York.  Upon information and belief, that investigation is ongoing.

19.    William Tsourapas is a resident of Chicago, Cook County, Illinois. Tsourapas is not a lawyer.  In 2000, Tsourapas suggested to Veleris that Veleris retain Jenkens to provide tax advice, which led to plaintiff's participation in Son of BOSS.  For sending plaintiff to Jenkens, Tsourapas received a secret, undisclosed referral fee.

## JURISDICTION AND VENUE

20.    Veleris is a citizen of Illinois, Deutsche Bank AG is a citizen of Germany, and DBSI is a citizen of New York or Delaware, and there are millions of dollars at issue in this case.  Thus, pursuant to 28 U.S.C. §1332, this Court has jurisdiction over this matter because there is complete diversity between the parties and the amount in controversy is in excess of $75,000.

21.    This Court has personal jurisdiction over defendants, which either (a) have offices in Illinois and are continuously and systematically engaged in business here; and/or (b) traveled to Illinois and/or communicated with Veleris (who was living in

Illinois) with respect to this transaction such that they could reasonably expect that personal jurisdiction would be appropriate in this Court.

22.     Pursuant to 28 U.S.C. §1391, venue is appropriate in this district because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Illinois.

**BACKGROUND**

## I.     THE FRAUDULENT TAX SHELTER SCHEME

A.     <u>Tax Shelters in General</u>

23.     A tax shelter is a method or device used to reduce or eliminate tax liability.  Some tax shelters advance a legitimate endeavor and are therefore lawful. Illegitimate or abusive tax shelters are those in which a significant purpose is the avoidance or evasion of taxes in a manner not intended by law.  The IRS deems a shelter unlawful if its economic purpose is tax avoidance.

24.     Economic substance is synonymous with risk—a deal has economic substance if there's a chance that the taxpayer could lose their investment.  If the outcome of a tax shelter is preordained, however, there is no risk.  Under such circumstances, the shelter is unlawful.

25.     Abusive tax shelters can be custom-designed for a single user or prepared as a generic tax product sold to multiple clients.  The Son of BOSS tax shelter complained of herein was sold to multiple clients, including plaintiff.  Astonishing amounts of money can be made from such a shelter.  Once a "template" or "cookie cutter" opinion is written, additional deals can be done as fast as they can be sold.

26.     The essence of the co-conspirators' fraudulent scheme was that they claimed that they had developed an "investment strategy" that had a reasonable likelihood of generating profits, but if not, any losses generated could be used to legally offset other taxable gains.  The co-conspirators aggressively marketed this "investment strategy" to plaintiff and others who generally lacked the sophistication to understand the enormously complex transactions that were required to consummate the strategy.  A typical target for sale of a Son of BOSS (or similar) transaction was someone who had sold a business or a substantial position in a business, realizing a substantial capital gain on the sale.  Generally, when a taxpayer suffers a loss in a particular investment, the taxpayer can use that loss to reduce any taxable gains made from separate investments.  Thus, as explained by the co-conspirators, if the tax strategy generated losses, those losses could be used to offset gains that plaintiff had otherwise realized.

B.     Terminology

27.     There are a number of different ways one can invest in securities.  In one of the simplest types of transactions, an individual or an entity can purchase a security outright.  In this instance, the purchaser is considered "long," and can only profit by an increase in the price of the purchased security.  Alternatively, the investor can borrow the security, sell it immediately, expecting the price of the stock to drop, and then buy it back to repay the loan.  In this case, the purchaser is considered "short," and can only profit by a decline in the market price of the borrowed security.

28.     An option, on the other hand, is not an outright purchase.  Instead, it gives a buyer the right to buy or sell a security at a definite price for a definite period of time, regardless of that item's future market price on the open market.  That security may be

stocks, bonds, commodities, or intangible market valuations such as the Standard & Poors' Index. Options are said to be "in the money" if the market price of the underlying security makes exercising the option profitable. Similarly, options are said to be "out of the money" when exercising the option would result in no gain or loss.

29.     An option position is "long" if the holder's profit is dependent on a rise in the value of an underlying item, while an option position is "short" if the holder's profit is dependent on a decrease in the value of any underlying item.

30.     Options are said to be "covered" when the seller of the option owns the item against which the option is made. Correspondingly, an option is "naked" when the seller does not own the item against which the option is made.

31.     Options may also be either "American" or "European." The key difference between American and European options relates to when the options can be exercised. A European option may be exercised only at the expiration date of the option, *i.e.*, at a single pre-defined point in time. An American option, on the other hand, may be exercised at any time before the expiration date.

32.     For example, an investor buys a "call" option on 1,000 shares of ABC stock with a "strike price" of $100 and an expiration date of July 16, 2003. This option gives the investor the right to purchase 1,000 shares of ABC for $100. Under the American option, the option holder can exercise the option by purchasing the shares at any time he chooses prior to July 16, 2003. Under a European option, the option holder can only elect to exercise the option on July 16, 2003.

33.     European option contracts are "digital" in the sense that the investor wins or loses a pre-determined amount in full, but only if the strike price is met. Thus, the

option is either "on" or "off," like a digital (binary) 1 or 0. As a result, European digital options contracts provide an investor with the same payout no matter how far the value of the underlying item rises above the strike price of the option. For example, a digital option may state that an investor will receive $1,000 if ABC Corp. closes at or above $12 per share on a certain date. If the price of ABC Corp is at or above $12 per share on the closing date, the investor is paid $1,000. If ABC does not close at or above $12 per share, the investor gets nothing and loses what he originally paid for the option. European digital options contracts are thus essentially wagers that a certain commodity or equity price will be above or beneath a given price on a certain date.

34. European or digital options contracts are ordinarily less expensive to purchase than American or standard options, as the exposure of the seller and potential profit by the buyer are limited to a pre-set amount that does not vary, regardless of the degree of fluctuation in the value of the underlying item. An American option, by contrast, gives the holder a wider range of risk and profit potential.

35. A "straddle" involves the use of offsetting positions in options contracts wherein the value of one position generally varies inversely with the value of the other position.

C.    Development of the Son of BOSS Tax Strategy

36. Traditionally, legitimate financial services firms provided tax advice to individual clients based on the client's specific circumstances, normally charging by the hour. Respected firms did not encourage their clients to participate in tax shelters, even though such shelters can be legal.

37.    In the mid-1990s, the situation changed.  Key financial services firms began developing "cookie cutter" tax "products" that were really tax shelters.  Rather than responding to client needs, the sellers of these products would first create a scheme to avoid tax liability, and then induce clients to enter into the necessary transactions, on the representation that the product was a legitimate means of reducing taxes.  The transactions executed in the course of implementing a particular tax product were essentially identical.  The investor would provide the required fee and would then have little or no further involvement in the product beyond claiming the tax benefits the product's promoters asserted they were entitled to.

38.    The financial services firms had a strong incentive to sell such products.  Because a single product could be resold to multiple clients, they were far more profitable than traditional tax consulting.  Moreover, there was a widespread perception that the promoters of abusive or illegal shelters faced little risk of meaningful punishment.  IRS penalties for tax shelter promoters and those who assisted them were weak and ineffective.

39.    Each defendant and co-conspirator played a role in creating, marketing, selling, and implementing Son of BOSS, including the transaction in which plaintiff participated.  All committed wrongful acts in furtherance of the conspiracy.  In the late 1990s, for example, several of the Deutsche Bank defendants' employees, along with several lawyers from Jenkens, developed and began marketing various tax shelters, including Son of BOSS.

40.    Upon information and belief, in the fall of 1999, Dan Brooks of Deutsche Bank visited Daugerdas in Chicago to present the idea of a tax shelter using foreign

currency digital options.  Brooks informed Daugerdas that the Deutsche Bank defendants

had substantial experience in designing and implementing foreign currency options for

tax shelters.  Brooks expressed a strong interest in the Deutsche Bank defendants working

with Jenkens in foreign options transactions and explained the types of options

defendants would design and execute, the contract, and the pricing.  Around the same

time, Deutsche Bank defendant employee Craig Brubaker met with Erwin Mayer at

Jenkens to discuss the use of foreign option contracts as part of tax shelters.  Jenkens and

the Deutsche Bank defendants collaborated in the development of numerous tax shelters,

including Son of Boss.  Eventually, Jenkens and the Deutsche Bank defendants marketed

these shelters to hundreds of people, including plaintiff.

41.    In reality, Son of BOSS and other tax shelters marketed and implemented

by defendants involved little or no risk.  Contrary to what he was told, Veleris couldn't

lose money (other than the substantial fees) because the underlying investments were

perfectly hedged.  Moreover, although the co-conspirators told Veleris that he could

make money, this possibility was so remote it was like winning the lottery—particularly

given the fees Veleris paid to participate in Son of BOSS.

42.    Defendants knew or should have known that the IRS would disallow Son

of BOSS because it was, at its core, a means to generate artificial deductible tax losses.

Despite the co-conspirators' knowledge of the scheme's illegality, however, they sought

out and convinced Veleris' to enter into and implement Son of BOSS, and in the process

collected substantial fees from Veleris.

43.    Eventually, the IRS deemed Son of BOSS to be a potentially abusive tax

shelter.  Potentially abusive tax shelters are those that are the same or similar to "listed

transactions," that is, a transaction the IRS has formally determined as "having a potential

for tax avoidance or evasion." The IRS requires that such tax shelters must be disclosed

and registered with the IRS.

44.    But Son of BOSS was never registered with the IRS as a potentially

abusive tax shelters. Son of BOSS was not even marketed to plaintiff as a tax shelter—it

was an "investment strategy" with potential, material tax benefits, according to the co-

conspirators—and the co-conspirators concealed from plaintiff their own concerns that

these products were abusive tax shelters that would not be approved by the IRS.

D.    Marketing and Implementation of Son of BOSS

45.    Both before and after plaintiff and others purchased Son of BOSS, the co-

conspirators represented to the participants that Son of BOSS was a legitimate tax

avoidance mechanism and that it was not a fraudulent tax shelter. These representations

were false and the co-conspirators knew them to be false (or were reckless in not

knowing them to be false).

46.    A key objective of co-conspirators' marketing was to convince the

potential Son of BOSS purchasers that the tax product was legitimate. The sales pitch

relied heavily on Jenkens and Deutsche Bank's reputations for integrity and expertise and

included explanations of how the tax laws purportedly allowed the benefits supposedly

provided. The presentations also included promises that the legality of Son of BOSS

would be affirmed in a legal opinion by Jenkens. Certain writings, oral statements and

visual presentations constituted an affirmative representation that Son of BOSS was not a

fraudulent tax shelter. In other words, the words and conduct of the co-conspirators

intentionally caused plaintiff and other Son of BOSS purchasers to believe that, at the

very least, there was a reasonable, good faith legal basis to claim the advertised and promised tax benefits.

47.     At all times, however, the co-conspirators had a duty to disclose to plaintiff and others the truth about the fraudulent nature of Son of BOSS.  Such a disclosure was necessary so that their representations about the tax products would not be false and misleading.  It was also required because, as each defendant and co-conspirator knew, Jenkens had a fiduciary relationship with plaintiff.  Nevertheless, no co-conspirator made such a disclosure.

48.     Included among the materially false and misleading representations and omissions co-conspirators made to plaintiff were the following:

(a)     Representing to plaintiff that Son of BOSS was valid, legitimate, and legal under federal and state laws;

(b)     Representing to plaintiff that Son of BOSS was a legitimate investment strategy that had a real chance of success; and

(c)     Representing to plaintiff that Son of BOSS was more likely than not to be upheld by the IRS and other relevant tax authorities.

49.     These representations and omissions were materially false and misleading because, as each co-conspirator knew, or was reckless in not knowing, SON of BOSS was an illegal tax strategy, as described herein.

50.     The false and misleading representations and omissions made to plaintiff are attributable to each of the co-conspirators because they were made by persons or entities acting as agents of, and in furtherance of, the conspiracy.  Moreover, each defendant committed wrongful acts in furtherance of the conspiracy.

51.     Plaintiff reasonably relied upon the misrepresentations and omissions of co-conspirators, and was fraudulently induced to purchase Son of BOSS. Absent these

misrepresentations and omissions, plaintiff would not have entered into the Son of BOSS transactions and, consequently, would not have suffered a loss.

## II.    THE ESSENTIAL ROLE OF THE DEFENDANTS

52.    The co-conspirators closely coordinated and cooperated in designing and implementing Son of BOSS.  The defendants and the other Co-Conspirators each had their own primary roles.  Jenkens was principally responsible for developing and selling SON OF BOSS.  Jenkens attracted clients by using its respected brand and its reputation for tax and legal expertise.  It also produced opinion letters, relied upon by the plaintiff, falsely describing the transactions comprising the tax strategy and falsely asserting that the strategy was legitimate.

53.    Moreover, a 2005 U.S. Senate Subcommittee Report, described more fully below, found that the tax shelters could not have been executed without the active and willing participation of major banks.  Specifically, the report found that Deutsche Bank and other banks "provided billions of dollars in lending critical to transactions which the banks knew were tax motivated, involved little or no credit risk, and facilitated potentially abusive or illegal tax shelters."  According to the report, Deutsche Bank provided billions in lines of credit for tax shelters.

54.    The involvement of the Deutsche Bank defendants was critical to the success of the fraudulent scheme.  Deutsche Bank was among a small number of financial institutions capable of providing the needed banking and trading services.  Son of BOSS ostensibly required exotic financial transactions that few, if any, other financial institutions would undertake in the ordinary course of business.  Consequently, Son of BOSS could not be sold unless an entity like Deutsche Bank agreed to participate.  To

ensure that Deutsche Bank would participate, the co-conspirators worked together to structure SON OF BOSS to minimize or eliminate any credit risk.

55.    As major international financial institutions with considerable tax expertise, the Deutsche Bank defendants were well aware that Son of BOSS was fraudulent.  They were concerned that their role would attract unfavorable publicity and the attention of bank regulators, especially since "know your customer" rules imposed on banks an affirmative duty to investigate their customers and their possible involvement in illegal activities.  In the end, Deutsche Bank's participation constituted an affirmative representation that Son of BOSS was valid, legitimate, purposeful, and suitable for plaintiff.  Each time Deutsche Bank sent out a trade confirmation or account statement, Deutsche Bank reinforced this false statement.  Moreover, upon information and belief, the Deutsche Bank defendants created false paper trails to minimize their role in Son of BOSS and other illegal tax shelters.

56.    Because officials at Deutsche Bank knew of the fraudulent nature of tax strategies, like Son of BOSS, and were concerned about potential liability, the bank's participation in the scheme had to be approved at a high level.  According to the Senate report, final approval for the bank's participation in at least one tax shelter (BLIPS) came from John Ross, Chief Executive Officer of Deutsche Bank Americas.  According to the minutes of the meeting at which Ross gave his approval, Ross insisted that the bank should participate in a limited number of the tax strategies, should not participate in any transaction where the taxpayer was "involved in litigation" (presumably with third parties on issues unrelated to the tax strategies), and should maintain a "low profile."  Ross

insisted that he be kept fully informed on future developments with respect to the tax strategies.

### III.    DEFENDANTS' MARKETING OF SON OF BOSS TO PLAINTIFF

57.    In December 2000, LaFrancaise was sold to SCIS Food Services, Inc. This transaction closed on December 22, 2000

58.    Plaintiff, therefore, anticipating incurring large capital gains for the tax year 2000, requested tax planning advice from Jenkens.  Plaintiff knew nothing about tax shelters at the time, and was not seeking to participate in a tax shelter.

59.    Actually, plaintiff was referred to Jenkens by Tsourapas, for which Tsourapas received a secret, undisclosed referral fee.  During 2001, Jenkens paid Tsourapas $8,500 as a result of Veleris' participation in Son of BOSS.  Neither Tsourapas nor Jenkens ever told plaintiff about this referral fee.

60.    At the recommendation of Jenkens, Veleris entered into a "Son of Boss" tax strategy in 2000.

61.    Jenkens informed Veleris that the tax strategy was a valid and legitimate means of minimizing taxes with respect to Veleris' capital gains in connection with the LaFrancaise transaction.  To add further legitimacy to the transaction, plaintiff was told that Jenkens would be setting up the required entities and providing a legal opinion, and that Deutsche Bank would be handling the underlying financial transactions.  Plaintiff understood that defendants would receive certain compensation in connection with Son of BOSS.  Upon information and belief, defendants received compensation above and beyond what was disclosed to plaintiff.

62.    Had Veleris known that Jenkens was paying secret, undisclosed referral fees to Tsourapas (and other co-conspirators), plaintiff would not have followed the tax and estate planning advice Jenkens gave, including Jenkens advice to engage in the Son of BOSS tax strategy.

63.    Jenkens' payment of fees to Tsourapas (and other co-conspirators) meant that Jenkens split the fees it charged Veleris.  In so doing, Jenkens shared legal fees with a non-lawyer in violation of Rule 5.4 of the Illinois Rules of Professional Conduct.  In addition, the arrangement violated Rule 7.2(b) of the Illinois Rules of Professional Conduct, which precludes a lawyer from giving "anything of value to a person for recommending or having recommended the lawyer's services."  By this arrangement, Tsourapas (and other co-conspirators) engaged in the unauthorized practice of law in violation of Illinois law.

## IV.    DEFENDANTS' IMPLEMENTATION OF PLAINTIFF'S SON OF BOSS TRANSACTION

64.    Jenkens recommended the formation of a number of entities in order for Veleris to effectuate the tax strategy.  Jenkens orchestrated the formation of these entities.

65.    Although complicated, the tax strategy Jenkens recommended with respect to Veleris was supposed to work as follows.  On November 27, 2000, JD Sprucewood entered into separate options contracts with Deutsche Bank to purchase digital options on (a) the Japanese Yen/Euro exchange rate at a strike price of 96.40 Japanese Yen per 1.0000 Euro with an expiration date of December 15, 2000, a settlement date of December 19, 2000, and a payoff amount of $1.7 million, for which he paid a premium of $850,000; and (b) the British Pound/Euro exchange rate at a strike price of 0.6155 Euros per 1.0000 British Pound with an expiration date of December 15, 2000, a settlement date

of December 19, 2000, and a payoff amount of $1.7 million, and paid a premium of $850,000 (collectively, the "Long Options"). At the same time, JD Sprucewood entered into separate options contracts with Deutsche Bank to sell digital options on (a) the Japanese Yen/Euro exchange rate at a strike price of 96.42 Japanese Yen per 1.0000 Euro and received a premium of $841,500 with an expiration date of December 15, 2000, a settlement date of December 19, 2000, and a payoff of $1,683,000; and (2) the British Pound/Euro exchange rate at a strike price of 0.6157 Euros per British Pound and received a premium of $841,500, with an expiration date of December 15, 2000, a settlement date of December 19, 2000, and a payoff amount of $1,683,000 (collectively, the "Short Options").

66.    On November 28, 2000, JD Sprucewood contributed the options to JV Partners as a contribution to capital. At the time, the options were "out of the money" and on December 1 and 6, 2000, the entities reached agreements with Deutsche Bank to terminate the options contracts.

67.    On December 12, 2000, JV Partners purchased Canadian dollars.

68.    On December 22, 2000, Veleris contributed his interest in JV Partners to Veleris & Associates.

69.    On December 26, 2000, JV Partners was dissolved and liquidated. In liquidation, all of the foreign currency was distributed to Veleris & Associates.

70.    On December 27, 2000, Veleris & Associates sold 96% of its interest in the foreign currency, which it received on liquidation from JV Partners.

71.    According to Jenkens, this series of events would lead to, among other things, the following tax treatment: (a) JD Sprucewood should be disregarded as an entity

for federal tax purposes; (b) the Options investments should be treated as non-taxable and separate for tax purposes; and (c) the basis for JD Sprucewood's contribution to JV Partners should include the Long Options (*i.e.*, a loss), but not the Short Options (*i.e.*, a gain). In sum, the strategy was supposed to generate a legitimate tax loss that Veleris could offset against capital gains realized in connection with the LaFrancaise transaction.

72.     The Deutsche Bank defendants were well aware of this structure, and of Jenkens' proposed tax treatment for the transaction. At all times, however, they gave plaintiff the impression the transaction was legitimate and had a real chance of making money—even though they knew this was not the case. Deutsche Bank knew or should have known that the purpose of the Son of BOSS transaction was to generate losses and not for a legitimate business purpose; knew or should have known that the transactions did not arise from bona fide business transactions and therefore would not generate valid and legal tax benefits to participants such as plaintiff; and that Jenkens was marketing the Son of BOSS program by giving participants false assurances as to the validity of the tax benefits that were to be obtained.

## V.      THE IRS INVALIDATES PLAINTIFF'S SON OF BOSS TRANSACTIONS

73.     Veleris filed his 2000 federal and State of Illinois tax returns that included Son of BOSS after April 15, 2001. And he filed his 2001 federal and State tax returns in 2002. Notably, these returns were finalized after the issuance of IRS Notices 99-59 and 2000-44. These tax returns improperly included the Son of BOSS deductions.

74.     In December 2001, the IRS announced a "tax amnesty program" in Announcement 2002-2. The program allowed taxpayers who voluntarily disclosed their involvement in tax shelter strategies, such as Son of BOSS, before April 23, 2002 to

avoid liability for penalties for underpayment of taxes without conceding liability for back taxes or interest. The program was an initiative aimed at using taxpayers to aid the IRS in identifying tax shelter promoters, such as the co-conspirators, who had failed to properly register tax shelters, like Son of BOSS, with the IRS.

75.     Plaintiff believes that the co-conspirators, however, never told him about the tax amnesty program. In any event, none of the co-conspirators advised plaintiff to participate in the program. Thus, the co-conspirators again withheld material information from Veleris about the legality of Son of BOSS and its likelihood of being upheld by the IRS. As a result, Veleris did not participate in the amnesty program. This failure resulted in plaintiff being subject to penalties, which would have been waived had plaintiff participated in the program.

76.     Upon information and belief, individuals at Jenkens and at defendants who had personally engaged in Son of BOSS (or a similar tax shelter) participated in the amnesty program and avoided IRS penalties. Thus, it appears that employees of the co-conspirators may have participated in the same amnesty program the co-conspirators failed to tell plaintiff about. None of the co-conspirators told Veleris these material facts.

77.     In June of 2003, the IRS formalized its position regarding certain tax strategies, including the tax strategies in which plaintiff participated, by issuing new regulations (the "Regulations") retroactive to October 18, 1999, and through Office of Chief Counsel Notice CC-2003-020 (the "OCC Notice"). The Regulations invalidated tax strategies, including Son of BOSS and the OCC Notice explained the IRS' position why.

78.    In early 2004, the IRS notified Veleris that there was a problem with respect to Son of BOSS.

79.    On or about May 5, 2004, in Notice 2004-46, the IRS, in furtherance of its previous pronouncements, offered to settle the audits of Son of BOSS participants by those parties paying to the IRS (a) all of the taxes avoided by use of these transactions; (b) all interest due; (c) a 10% penalty; and (d) a loss of 50% of the fees and other "out of pocket" costs deducted.  If taxpayers did not accept the offer, the IRS indicated it would assess all tax due and interest, lose all deductions, and impose a 40% penalty.

80.    As a result of the faulty tax transaction, plaintiff participated in IRS settlement initiative 2004-46 and had to file amended tax returns with federal and state tax authorities.  As a result of the settlement, plaintiff had to pay hundreds of thousands in more taxes.  He also had to pay over $150,000 in penalties and interest that he would not have had to pay had they not employed the tax strategy.

## VI.    THE GOVERNMENT INVESTIGATION INTO ILLEGAL TAX SHELTERS

81.    In October 2002, the U.S. Senate Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs ("Senate Subcommittee") began an investigation into the development, marketing, and implementation of abusive tax shelters.  In November 2003, the Senate Subcommittee held public hearings and in February 2005, it issued a report entitled "The Role of Professional Firms in the U.S. Tax Shelter Industry," (the "Senate Report").  The report was based on information gathered during two public hearings, numerous interviews and depositions, and the review of over 250 boxes of documents and electronic data.

82.    According to the Senate Report, the U.S. tax shelter industry "aggressively marketed" generic "tax products," and that the implementation of those tax shelters required close collaboration between accounting firms, law firms, investment advisory firms, and banks.

83.    Among other things, the Senate Report contained the following findings:

(a)    "[t]he sale of potentially abusive and illegal tax shelters has become a lucrative business in the United States, and some professional firms such as accounting firms, banks, investment advisory firms, and law firms are major participants in the mass marketing of generic "tax products" to multiple clients."

(b)    Some major banks, including Deutsche Bank, have provided critical lending or investment services or participated as essential counter parties in potentially abusive or illegal tax shelters. Moreover, Deutsche Bank knew the strategies were "tax motivated, involved little or no credit risk, and facilitated potentially abusive or illegal tax shelters." The tax shelters examined by the Senate Committee "could not have been executed without the active and willing participation of major banks."

84.    As described above, Jenkens has admitted that it marketed fraudulent tax shelters and issued fraudulent legal opinions. In addition, it has paid $76 million as a penalty for its tax shelter work.

85.    Moreover, prior to May 2004, a class of plaintiff sued Jenkens for Jenkens' improper marketing of tax shelters. Eventually, Jenkens agreed to settle the *Denney v. Jenkens & Gilchrist* litigation for $70 million and in January 2007 a final judgment was entered. Finally, in large part as a result of its widespread marketing of tax shelters, Jenkens dissolved. Consequently, Jenkens is no longer a practicing law firm.

86.    Upon information and belief, the Deutsche Bank defendants (and perhaps Amex) are still under investigation by the federal government.

## VII.    PLAINTIFF HAS SUFFERED SUBSTANTIAL DAMAGES

87.    But for the co-conspirators' material misrepresentations and misleading omissions, plaintiff would not have entered into the Son of BOSS transaction, paid for tax advice, paid millions of dollars in additional expenses to execute the Son of BOSS transaction, foregone legitimate tax savings opportunities, filed federal and State of Illinois tax returns in 2000 and 2001 that reflected deductions for capital losses resulting from the Son of BOSS transactions and failed to amend his tax returns, thereby incurring additional penalties and interest.

88.    Veleris paid Jenkens $86,921 in fees and expenses to participate in Son of BOSS.

89.    Veleris paid a presently unknown amount (but believed to be in the thousands) more to the Deutsche Bank defendants to execute the currency and options transactions underlying Son of BOSS.  And upon information and belief, the Deutsche Bank defendants may have received other secret, undisclosed compensation from Jenkens as well.

90.    Ultimately, Veleris paid hundreds of thousands of dollars in additional taxes because the tax strategy didn't work.  Veleris paid $645,085 in additional taxes to the U.S. government for 2000 and $29,575 for 2001.  He paid $64,508.50 in federal penalties for 2000 and $2,957.50 for 2001, and $74,191.86 in federal interest for 2000 and $3,471.37 for 2001.  Veleris paid $49,638 in additional taxes to the State of Illinois for 2000 and $2,149 for 2001.  And he paid $10,733 in interest to the State of Illinois for 2000 and $311 for 2001.

91.    Veleris also paid approximately $10,000 for legal and accounting advice concerning resolution of Son of BOSS issues.

92.    At present, therefore, Veleris is believed to have incurred the following damages as a result of the co-conspirators' wrongful conduct:

| Back Taxes | Fees[1] | Penalties | Interest | Other Fees | Total |
|---|---|---|---|---|---|
| $724,298 | $86,921 | $67,466 | $88,707.23 | $10,000 | **$977,392.23** |

93.    Had plaintiff not engaged in Son of BOSS, he would have explored and engaged in other legitimate and lawful tax saving opportunities.

94.    The co-conspirators' fraudulent misrepresentations and material omissions were malicious and in reckless disregard of plaintiff's rights.  They constituted gross deception and willful and wanton misconduct, for which plaintiff is entitled to punitive or exemplary damages.

### Count I – Civil Conspiracy

95.    Plaintiff repeats and realleges paragraphs 1-94 as if fully set forth herein.

96.    As described more fully above, the defendants and other co-conspirators knowingly entered into an agreement to participate in a scheme to create and market Son of BOSS and to induce Veleris to enter into the illegal Son of BOSS transaction in order to obtain professional and other fees from plaintiff.  In so doing, defendants and the other co-conspirators acted with full awareness that the Son of BOSS transactions were designed to give the false impression that a complex series of financial transactions were legitimate business transactions with economic substance from an investment standpoint, which features would have been necessary for a successful and legal tax strategy.

---

[1] This does not include fees and expenses paid to Deutsche Bank AG or DBSI.  Those fees and expenses are not yet known with precision.

97.    Defendants acted in their respective roles as described above according to a predetermined and commonly understood accepted plan of action (i.e., the defendants' arrangement), all for the purposes of obtaining professional fees from Veleris and other Son of BOSS participants.

98.    The acts of the co-conspirators were contrary to law and included fraudulent misrepresentation, negligent misrepresentation, malpractice, and breaches of fiduciary duty.

99.    The co-conspirators, including defendants, agreed to commit the unlawful acts alleged herein.  There was a meeting of the minds among the defendants and the other co-conspirators to commit the unlawful acts alleged herein.

100.    Each of the defendants acted in the respective roles described above according to a predetermined and commonly understood and accepted plan to further the conspiracy.  Each committed unlawful acts in furtherance of the conspiracy.

101.    The defendants' actions were contrary to numerous provisions of law.

102.    The defendants' agreement and unlawful actions pursuant to and in furtherance of the common scheme described above proximately caused Veleris damages as previously set forth herein.

103.    Each defendant is liable for the misrepresentations and omissions made by each of the other defendants as a principal and co-conspirator.

104.    As a result of defendants' conduct set forth herein, Veleris has been injured.

WHEREFORE, plaintiff respectfully requests that the Court enter judgment in his favor and against defendants, jointly and severally, as follows:

(a)    An award of compensatory damages to be established definitively at trial;

(b)    An award of appropriate prejudgment interest;

(c)    An award of punitive or exemplary damages; and

(d)    Such other relief as this Court deems reasonable, necessary, and just.

### Count II – Common Law Fraud

105.    Plaintiff repeats and realleges paragraphs 1-94 as if fully set forth herein.

106.    As set forth above, defendants knowingly made numerous false statements of material fact and intentionally omitted material facts from plaintiff, including: (1) persuading Veleris to enter into the Son of BOSS transaction; and (2) at all times, conveying that the transaction was valid and legitimate.  The Deutsche Bank defendants were heavily involved in the creation of Son of BOSS, but also in its implementation with respect to Veleris.  On numerous occasions, including through the use of monthly account statements and trade confirmations, the Deutsche Bank defendants conveyed that the transactions underlying Son of BOSS were valid, legitimate, purposeful, suitable for Veleris, and had a reasonable prospect of profit.  Moreover, the Deutsche Bank defendants knew that Jenkens was making false statements and omitting material facts from plaintiff in order to induce plaintiff to participate in Son of BOSS.

107.    The above affirmed representations and omissions made by each defendant were false, misleading, and material when made or omitted and the defendants knew these representations and omissions to be false, misleading, and material when made or omitted with the intention that Veleris would rely upon them in entering into the Son of BOSS transaction and pay them substantial fees.

108.    Defendants had a duty to disclose the material facts that it concealed from plaintiff.

109.    Plaintiff would not have agreed to invest in the Son of BOSS transaction if he had known of defendants' omissions or that defendants' representations were false.

110.    Plaintiff could not have discovered the concealed information through reasonable inquiry or inspection.

111.    Plaintiff reasonably relied to his detriment upon the truth of defendants' material misrepresentations and omissions of material fact in deciding to enter into the Son of BOSS transaction, in paying large fees to defendants for tax advice, and in sticking with Son of BOSS throughout the transaction.  Moreover, plaintiff did not avail himself of legitimate tax savings opportunities and deductions, filed federal and state tax returns in 2000 and 2001 that reflected deductions for losses resulting from Son of BOSS and the defendants' fees, and did not promptly amend those returns, thereby incurring substantial back taxes and out-of-pocket losses.

112.    But for defendants' intentional misrepresentations and material omissions described above, Veleris would never have hired defendants for advice on the Son of BOSS transaction, engaged in the Son of BOSS transaction, claimed the purportedly resulting losses on his income tax returns, or filed and signed his 2000 tax returns prepared in accordance with Jenkens' opinion letter or in reliance on defendants' advice, and otherwise failed to avail himself of legitimate tax savings opportunities and deductions.

WHEREFORE, plaintiff respectfully requests that the Court enter judgment in his favor and against defendants, jointly and severally, as follows:

(a)     An award of compensatory damages to be established definitively at trial;

(b)     An award of appropriate prejudgment interest;

(c)     An award of punitive or exemplary damages; and

(d)     Such other relief as this Court deems reasonable, necessary, and just.

## Count III – Negligent Misrepresentation

113.    Plaintiff repeats and realleges paragraphs 1-94 as if fully set forth herein.

114.    Defendants were in the business of giving information and guidance to clients to be used in those clients' business transactions.

115.    Accordingly, defendants had a duty to communicate accurate information to plaintiff.

116.    Defendants (as alleged above), made false statements of material fact and omitted to disclose material facts to plaintiff.  Ultimately, defendants knew or should have known that Son of BOSS was not a legitimate tax strategy, but continuously pretended otherwise to plaintiff.  Defendants intentionally or negligently failed to disclose this information to plaintiff.

117.    Plaintiff would not have agreed to invest in the Son of BOSS transaction if he had known that defendants' representations were false or if he had been aware of the material omissions.

118.    Defendants were careless or negligent in failing to ascertain the truth of the statements they made to plaintiff and in failing to disclose all the material facts relevant to the Son of BOSS transaction.

119.    In making the material misstatements and omitting to disclose material facts, defendants intended to induce plaintiff to invest in the Son of BOSS transactions and pay large fees to defendants.

120.    Defendants' intentional omissions were made willfully, wantonly, or recklessly to plaintiff to induce the purchase of Son of BOSS.

121.    Plaintiff reasonably relied upon the truth of defendants' statements in deciding to invest in the Son of BOSS transaction, in agreeing to pay large fees to defendants, and in taking the other actions prescribed by defendants and the other co-conspirators.

122.    But for defendants' intentional misrepresentations and material omissions described above, Veleris would never have participated in Son of BOSS.

123.    As a result of his reliance on defendants' material misrepresentations and omissions of material fact, Veleris has suffered substantial damages.

WHEREFORE, plaintiff respectfully requests that the Court enter judgment in his favor and against defendants, jointly and severally, as follows:

(a)    An award of compensatory damages to be established definitively at trial;

(b)    An award of appropriate prejudgment interest;

(c)    An award of punitive or exemplary damages; and

(d)    Such other relief as this Court deems reasonable, necessary, and just.

### Count  IV – Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act

124.    Plaintiff repeats and realleges paragraphs 1-94 as if fully set forth herein.

125.    Defendants engaged in unfair and deceptive business acts and practices described above, in violation of Section 2 the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*.

126.    Defendants' unfair and deceptive acts and practices occurred in the conduct of trade and commerce, including offering the Son of BOSS tax shelter product for sale.

127.    Defendants used or employed deception, fraud, false pretense, false promise, misrepresentation and the concealment, suppression or omission of material facts with intent that Veleris rely upon the misrepresentation, concealment, suppression or omission of such material facts.

128.    Defendants actions were taken with actual or deliberate intention to harm plaintiff, or if not intentional, with an utter indifference to or the conscious disregard for the injury to plaintiff.

129.    Defendants' unfair and deceptive acts and practices caused plaintiff substantial damages.

130.    Defendants' actions occurred in the course of conduct involving trade or commerce within the State of Illinois, namely the marketing and implementation of tax and investment advice and implementation.

131.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10a(c), allows a court to award attorney's fees and costs to a prevailing plaintiff.

WHEREFORE, plaintiff respectfully requests that the Court enter judgment in his favor and against defendants, jointly and severally, as follows:

(a) An award of compensatory damages to be established definitively at trial;

(b) An award of appropriate prejudgment interest;

(c) An award of punitive or exemplary damages;

(d) Costs and attorneys' fees as provided by statute; and

(e) Such other relief as this Court deems reasonable, necessary, and just.

### Count V – Assisting in the Breach of Fiduciary Duty

132. Plaintiff repeats and realleges paragraphs 1-94 as if fully set forth herein.

133. Jenkens owed fiduciary duties to plaintiff to exercise its best care, skill, judgment and compliance with the applicable codes of professional and ethical responsibility.

134. Jenkens breached its fiduciary duties to plaintiff by, among other things, advising him to engage in the Son of BOSS transaction, which Jenkens knew or should have known to be improper and for the sole purpose of generating large fees and profits for themselves, and by not providing complete and truthful information to Veleris when promoting Son of BOSS.

135. Defendants knew of Jenkens' fiduciary duties to plaintiff, and knew of the breaches thereof.

136. Defendants knew or should have known that Jenkens was acting as an unregistered promoter of a tax shelter and concealed that fact and its implications from Veleris in order to obtain substantial fees.

137. Defendants induced and participated in these fiduciary breaches by persuading Veleris to engage in Son of BOSS, by providing the facilities for and acting as

the counterparty in the currency, options, and stock transactions, by providing substantial assistance to and playing a substantial role in the defendants' arrangement, and by remaining silent and failing to inform Veleris that Son of BOSS would not provide plaintiff with legitimate tax losses, or with any reasonable prospect of profits, which defendants knew was an expectation that Veleris had.

138.    Defendants benefited from Jenkens' breach of fiduciary duties by receiving fees from plaintiff.

139.    Plaintiff did not know, nor could he have reasonably known, that he was injured by defendants' assistance of Jenkens' breach of fiduciary duties or that such injury was wrongfully caused until he learned that the IRS was disallowing capital losses for the Son of BOSS transaction.

140.    An award of punitive damages based on the defendants' assistance in Jenkens' breach of fiduciary duty is appropriate because defendants acted willfully or with such gross negligence as to indicate a wanton disregard for plaintiff's interests and rights.

WHEREFORE, plaintiff respectfully requests that the Court enter judgment in his favor and against defendants, jointly and severally, as follows:

(a)    An award of compensatory damages to be established definitively at trial;

(b)    An award of appropriate prejudgment interest;

(c)    An award of punitive or exemplary damages; and

(d)    Such other relief as this Court deems reasonable, necessary, and just.

Dated: March 6, 2008                    JOHN VELERIS


                                        By:_____/s/ Adam P. Merrill_____
                                              One of his attorneys


Adam P. Merrill  (6229850)
Scott F. Hessell (6275119)
SPERLING & SLATER
55 West Monroe St., Suite 3200
Chicago, Illinois 60603
(312) 641-3200